T.C. Memo. 1997-325


UNITED STATES TAX COURT


DAVID AND SHIRLEY SINGER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22931-86.                    Filed July 16, 1997.


<u>Stuart A. Smith</u> and <u>David H. Schnabel</u>, for petitioners.

<u>Paul Colleran</u>, <u>Maureen T. O'Brien</u>, and <u>William T. Hayes</u>, for

respondent.

CONTENTS

|                                                                          | Page |
|--------------------------------------------------------------------------|------|
| MEMORANDUM FINDINGS OF FACT AND OPINION                                   | 2    |
| OPINION OF THE SPECIAL TRIAL JUDGE                                        | 2    |
| FINDINGS OF FACT                                                          | 5    |
| A. The Plastics Recycling Transactions                                   | 5    |
| B. Plymouth Equipment Associates                                         | 7    |
| C. Richard Roberts                                                       | 9    |
| D. Petitioners and Their Introduction to Plymouth Equipment Associates   | 10   |
| OPINION                                                                   | 17   |
| A. Section 6653(a)--Negligence                                           | 19   |

    1. The So-Called Oil Crisis.............................21
    2. Petitioner's Purported Reliance on an Adviser........24
    3. Miscellaneous.......................................31
    4. Conclusion as to Negligence.........................40
  B. Section 6659--Valuation Overstatement.....................41
    1. The Grounds for Petitioners' Underpayments ..........42
    2. Concession of the Deficiency........................47
    3. Section 6659(e).....................................50
  C. Petitioners' Motion for Leave To File Motion for
    Decision Ordering Relief from the Negligence Penalty
    and the Penalty Rate of Interest and To File Supporting
    Memorandum of Law.........................................53

## MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  This case was assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.  All section references are to the Internal Revenue Code in effect for the tax year in issue, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.  The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

## OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, <u>Special Trial Judge</u>:  This case is part of the Plastics Recycling group of cases.  For a detailed discussion of the transactions involved in the Plastics Recycling cases, see <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).  The facts of the underlying transactions and the Sentinel recyclers in this case are substantially identical to those considered in the <u>Provizer</u> case.

In a notice of deficiency dated March 26, 1986, respondent determined a deficiency in petitioners' 1981 joint Federal income tax in the amount of $102,686, plus an addition to tax under section 6659 for valuation overstatement in the amount of $30,465. Respondent also determined that interest on the deficiency accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c).[1]

In a first amendment to answer, respondent asserted additions to tax for 1981 in the amount of $5,134 under section 6653(a)(1) for negligence, and under section 6653(a)(2) in the amount of 50 percent of the interest due on the underpayment attributable to negligence.

In respondent's trial memorandum and posttrial brief, respondent asserted a lesser addition to tax under section 6659 for valuation overstatement in the amount of $24,758. We consider the addition to tax under section 6659 to be reduced accordingly.

---

[1] The deficiency notice refers to sec. 6621(d). This section was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744, and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 1989), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 1989 sec. 7721(d), 103 Stat. 2400. The repeal does not affect the instant case. For simplicity, we refer to this section as sec. 6621(c). The annual rate of interest under sec. 6621(c) for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.

The parties filed a Stipulation of Settled Issues concerning the adjustments relating to petitioners' participation in the Plastics Recycling Program. The stipulation provides:

1. Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program.

2. The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax motivated transactions, subject to the increased rate of interest established under I.R.C. §6621(c), formerly section 6621(d).

3. This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for valuation overstatements under I.R.C. §6659 and for negligence under the applicable provisions of I.R.C. §6653(a).

4. With respect to the issue of the addition to the tax under I.R.C. §6659, Petitioners do not intend to contest the value of the Sentinel Recycler or the existence of a valuation overstatement on the Petitioners' returns; however, Petitioners reserve their right to argue that the underpayment in tax is not attributable to a valuation overstatement within the meaning of I.R.C. §6659(a)(1), and that the Secretary should have waived the addition to tax pursuant to the provisions of I.R.C. §6659(e).

In their petition, petitioners raised the statute of limitations on assessment as a bar to respondent's deficiency determination. Respondent asserted otherwise in the answer, and petitioners have not argued the statute of limitations elsewhere in the record. In view of the third stipulation in the

stipulation of settled issues, we consider that any statute of limitations defense has been conceded by petitioners.

The issues remaining in this case are:  (1) Whether petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (2); and (2) whether petitioners are liable for the addition to tax under section 6659 for underpayment of tax attributable to a valuation overstatement.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein by this reference.

## A.  The Plastics Recycling Transactions

This case concerns petitioners' investment in Plymouth Equipment Associates (Plymouth), a limited partnership that leased seven Sentinel expanded polyethylene (EPE) recyclers.  The transactions involving the Sentinel EPE recyclers leased by Plymouth are substantially identical to those in the Clearwater Group limited partnership (Clearwater), the partnership considered in Provizer v. Commissioner, T.C. Memo. 1992-177. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in the Provizer case.

In transactions closely resembling those in the Provizer case, Packaging Industries, Inc. (PI), manufactured and sold seven Sentinel EPE recyclers to ECI Corp. for $981,000 each.  ECI

Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each. F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F & G Corp. was paid in cash with the remainder financed through notes. These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

No arm's-length negotiations for the price of the Sentinel EPE recyclers took place among PI, ECI, and F & G Corp. All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. Although the recyclers were sold and leased for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Both Clearwater and Plymouth leased Sentinel EPE recyclers from F & G Corp. and licensed those recyclers to FMEC Corp.

Apart from leasing and licensing seven recyclers instead of six, the underlying transactions involving Plymouth do not differ in any substantive respect from the Clearwater transactions considered in the Provizer case.

For convenience, we refer to the series of transactions among PI, ECI Corp., F & G Corp., Plymouth, FMEC Corp., and PI as the Plymouth transactions. In addition to the Plymouth transactions, a number of other limited partnerships entered into transactions similar to the Plymouth transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene (EPS) recyclers. We refer to these collectively as the Plastics Recycling transactions.

## B. Plymouth Equipment Associates

Plymouth is a New York limited partnership that closed on December 21, 1981. Richard Roberts (Roberts) is the general partner of Plymouth.

A private placement memorandum for Plymouth was distributed to potential limited partners. Reports by F & G Corp.'s evaluators, Dr. Stanley M. Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z. Burstein (Burstein), a mathematics professor, were appended to the offering memorandum. Ulanoff owns a 1.27-percent interest in Plymouth and a 4.37-percent interest in Taylor Recycling Associates. Burstein owns a 2.605-percent interest in Empire Associates and a 5.82-percent interest in Jefferson Recycling Associates. Like Plymouth, Taylor

Recycling Associates, Empire Associates, and Jefferson Recycling Associates are partnerships that leased Sentinel recyclers. Burstein also was a client and business associate of Elliot I. Miller (Miller), the corporate counsel to PI.

The Plymouth offering memorandum states that the general partner will receive fees from Plymouth in the amount of $37,500. According to the offering memorandum, 10 percent of the proceeds from the offering--$97,500--was allocated to the payment of sales commissions and offeree representative fees. The offering memorandum further provides that the general partner "may retain as additional compensation all amounts not paid as sales commissions or offeree representative fees". Roberts therefore was to receive a minimum of $37,500 and up to $135,000 from Plymouth.

The offering memorandum lists significant business and tax risk factors associated with an investment in Plymouth. Specifically, the offering memorandum states: (1) There is a substantial likelihood of audit by the Internal Revenue Service (IRS) and the purchase price paid by F & G Corp. to ECI Corp. probably will be challenged as being in excess of fair market value; (2) Plymouth has no prior operating history; (3) the general partner has no prior experience in marketing recycling or similar equipment; (4) the limited partners have no control over the conduct of Plymouth's business; (5) there is no established market for the Sentinel EPE recyclers; (6) there are no

assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) certain potential conflicts of interest exist.

Although the offering memorandum represented that the Sentinel EPE recycler was a unique machine, it was not. Several machines capable of densifying low density materials were already on the market in 1981. Other plastics recycling machines available during 1981 ranged in price from $20,000 to $200,000, including the Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177.

C. Richard Roberts

Roberts is a businessman and the general partner in a number of limited partnerships that leased and licensed Sentinel EPE recyclers, including Plymouth. He also is a 9-percent shareholder in F & G Corp., the corporation that leased the recyclers to Plymouth. From 1982 through 1985, Roberts maintained the following office address with Raymond Grant (Grant), the sole owner and president of ECI Corp.:

> Grant/Roberts
> Investment Banking
> Tax Sheltered Investments
> 745 Fifth Avenue, Suite 410
> New York, New York 10022

Grant was instrumental in the hiring of Ulanoff as an evaluator of the Plastics Recycling transactions; the two had met on a

cruise.  Roberts and Grant together have been general partners in other investments.

Prior to the Plymouth transactions, Roberts and Grant were clients of the accounting firm H. W. Freedman & Co. (Freedman & Co.).  Harris W. Freedman (Freedman), a certified public accountant (C.P.A.) and the named partner in Freedman & Co., was the president and chairman of the board of F & G Corp.  He also owned 94 percent of a Sentinel EPE recycler.  Freedman & Co. prepared the partnership returns for ECI Corp., F & G Corp., and Plymouth.  It also provided tax services to John D. Bambara (Bambara).  Bambara is the 100-percent owner of FMEC Corp., as well as its president, treasurer, clerk, and director.  He, his wife, and daughter also owned directly or indirectly 100 percent of the stock of PI.

D.  Petitioners and Their Introduction to Plymouth Equipment Associates

Petitioners resided in Fort Lee, New Jersey, at the time their petition was filed.  Hereafter, reference to petitioner in the singular denotes David Singer.

In 1930, at the age of 16, petitioner left high school during his sophomore year and entered the work force.  By the late 1930's he was selling, with some success, sundry goods and dresses.  Petitioner then served in the Army for 45 months. Approximately 1 year after completing his military service petitioner became a salesman for a floor covering business, Hy

Abrams Co., owned by his brother-in-law.  Petitioner also helped his father, a carpenter, collect rent on houses his father owned on the lower East Side of Manhattan.  In the 1950's his father sold those houses and purchased several apartment buildings in Harlem.  Together the buildings had a total of 28 apartment units.

In 1960 petitioner's father passed away, and petitioner inherited the apartment buildings.  At that time petitioner's brother-in-law offered to sell him an interest in Hy Abrams Co., but only if petitioner sold the apartment buildings so he could devote more time to the business.  Petitioner did so and invested the proceeds in Hy Abrams Co. for a 30-percent interest.  Hy Abrams Co. became Hy Abrams Corp., and petitioner was named vice president, although he continued to devote his attention primarily to sales activities.  In 1978 petitioner's brother-in-law retired, and the corporation was liquidated.  Petitioner was not yet ready to retire, and with his daughter he started his own floor covering business named Singer Carpet Distributors, Inc. (Singer Carpet).  Petitioner operated Singer Carpet out of a warehouse in New Jersey for 4 years before retiring at the age of 68.

On their 1981 Federal income tax return, petitioners reported gross income from wages, interest, dividends, and

capital gains[2] in the amount of $373,286, less $34,669 in losses from partnerships, trusts, etc., including losses here in issue. Consequently, in the absence of significant deductions or credits, petitioners were subject to payment of Federal income taxes in a substantial amount for taxable year 1981.

In 1981, petitioner acquired a 5.07-percent limited partnership interest in Plymouth for $50,000. As a result of the investment in Plymouth, on their 1981 return petitioner and his wife Shirley claimed an operating loss in the amount of $40,555, and investment tax and business energy credits totaling $82,526. Respondent disallowed petitioners' claimed operating loss and credits related to Plymouth in full.

Petitioner learned of the Plastics Recycling transactions and Plymouth in November or December of 1981 from Abraham Bramnick (Bramnick). Bramnick is a stockbroker with the brokerage house Bond Richmond in New York City. Petitioner and Bramnick have known each other socially since the late 1960's or early 1970's. Prior to 1981, petitioner and Bramnick invested in some initial public offerings (IPO's) together, and according to petitioner, most of these were successful. Petitioner recalled his introduction to the Plastics Recycling transactions and Plymouth as follows:

---

[2] The bulk of petitioners' income for 1981 derived from gross capital gains in the amount of $313,523 ($292,960 of which was short-term capital gain).

There was one before [Plymouth], I think it was Empire, and for some reason or other, I didn't jump at it and then [Bramnick] called me, well, you missed it, because they've got all the members they needed, they don't have it--they may not have it again. Then they came back a week or two later, I don't remember, but he said, this thing is alive again * * *.

Petitioner did not recount any other conversations he may have had with Bramnick or the substance of the broker's advice, if any. Bramnick did not testify at the trial of this case.

Petitioner also discussed the Plastics Recycling transactions with Martin Bach (Bach), a certified public accountant (C.P.A.). Bach and petitioner were introduced sometime in 1981 by Bramnick. At the time, petitioner was looking for a tax return preparer. Petitioner retained Bach, and Bach prepared petitioners' return for 1981 and for several years thereafter.

Bach does not have any education or work experience in engineering, plastics materials, or plastics recycling. He graduated cum laude with a B.S. degree in accounting from Long Island University in 1947. Three years later he became a certified public accountant in New York State. After college, Bach worked for several accounting firms before founding his own practice in 1956, named Martin Bach & Co., P.C. (Bach & Co.).

Bach headed Bach & Co. for approximately 30 years until his practice was taken over by another firm. Located in the Wall Street area, Bach & Co. primarily serviced stock brokerage houses. The firm represented clients before the Securities and

Exchange Commission (SEC), provided tax services, and performed certified audits on a monthly and annual basis. Bach & Co. performed accounting services for approximately 50 brokerage houses during Bach's tenure and employed five accountants at its peak. Over the course of his career, Bach reviewed a large number of prospectuses and offering circulars that were filed with the SEC, as well as private placements that had been suggested to clients.

Like petitioner, Bach learned of the Plastics Recycling transactions and Plymouth in 1981 from Bramnick. Bond Richmond was a longstanding client of Bach & Co., and Bramnick was Bach's primary contact at Bond Richmond. On occasion, Bramnick forwarded private placement memoranda to Bach, "just to look at". In this instance, Bramnick sent Bach the Plymouth offering memorandum and asked him what he thought about it. Bach reviewed the offering memorandum for approximately 3 hours. He found the economic projections "very lucrative", to the investor, even if reduced "by 50-percent". Bach then met with Bramnick and told him that he thought the situation was interesting and that it warranted further investigation. He also received a phone call from petitioner asking for his thoughts about Plymouth.

Next, Bach contacted Peter Gardino (Gardino), a broker who had traded for one of Bach & Co.'s former accounts. During 1981 Gardino was working in the syndicate department of a brokerage house. Gardino reviewed the Plymouth offering memorandum and

arranged for the two of them to visit the PI plant in Hyannis, Massachusetts, sometime in November. Bach invited Bramnick to go with them. Bach explained: "I thought he would go too, but he didn't want to go." Petitioner recalled that Bach also extended an invitation to him to visit the PI plant in Hyannis, but petitioner declined.

Gardino and Bach toured the PI plant. Bach testified that he was impressed with the plant and the "spirit of the workers." Although the Sentinel EPE recycler was explained to Bach, he did not understand "the technicalities of the machine too well". Bach recalls being told that the Sentinel EPE recycler was unique, but he could not remember what he was told about the capability of the machine or its place in the market. He testified, "I just don't remember being told specifically by anybody anything--they told me a lot of things when I was up there, but I don't remember all the things they told me. Pete [Gardino] was asking most of the questions." Bach did not review any of the accounting or cost records pertaining to the Sentinel EPE recycler while he was at PI, nor did he ask to see them.

In addition to touring the PI plant, Bach and Gardino were taken by a PI representative to visit some end-users of the machines and see them in operation. Gardino and Bach questioned the end-users, but Bach's lack of understanding limited the number of questions he could ask to one. Bach recalled that, "The only question I asked the people was about the breakdown,

does the machine breakdown because I don't have a great technical background." He understood from the end-users that the machine was functioning perfectly well.

Bach did not consult an independent appraiser with respect to the value of the Sentinel EPE recycler, but instead relied upon the representations in the Plymouth offering memorandum. As Bach recalled: "I believe that I saw * * * an independent appraisal stating how they got to the value of the machine based upon the production, the income the pellets would bring, the royalties, et cetera." Bach did not investigate the market for recycled resin pellets. Nor did he contact the F & G Corp. evaluators or inquire if either of them had an interest in the Plastics Recycling transactions. Bach concluded that the author of the appraisal--whose name he could not recall--was independent based on what he read in the offering memorandum.[3]

After returning from Hyannis, Bach related his observations to Bramnick. Bach recalled speaking to petitioner only by telephone. Bach could not recall the substance of his communication to petitioner or for how long they spoke. He characterized petitioner as "basically only an annual tax account" and explained that he "didn't see * * * [petitioner] on a regular basis". With respect to Plymouth, Bach "spoke mostly

---

[3] The reports by the F & G Corp. evaluators, Ulanoff and Burstein, are the only reports appended to the offering memorandum that assess the Sentinel EPE recycler in any respect.

to Mr. Bramnick", who in turn saw petitioner on a regular basis. Bach recalled arguing with Bramnick because Bramnick wanted petitioner to purchase two limited partnership units at a cost of $100,000, whereas Bach thought "one is enough".  Bond Richmond, not Bach, was petitioner's offeree representative for Plymouth, and that status entitled it to a commission equal to 10 percent of petitioner's investment.

In contrast to Bach's recollection of events, petitioner claims that after Bach returned from Hyannis, he and his wife discussed the Plymouth transaction with Bach at a dinner meeting. According to petitioner, Bach informed them that he and a client had visited PI and thought well of it, and that Bach was taking another client, who petitioner knew was "a very successful attorney for some insurance company."  As petitioner recalls, "I said if it was good enough for those fellows, it's * * * good enough for me.  So that's when we made up our mind to do it."

Petitioners have no education or work experience in plastics materials or plastics recycling.  They did not read the Plymouth offering memorandum, see a Sentinel EPE recycler, or otherwise investigate Plymouth or the Plastics Recycling transactions to any extent.  Petitioners never made a profit in any year from their investment in Plymouth.

OPINION

We have decided a large number of the Plastics Recycling group of cases. Provizer v. Commissioner, T.C. Memo. 1992-177,

affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), concerned the substance of the partnership transaction and also the additions to tax.  See also Greene v. Commissioner, T.C. Memo. 1997-296; Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, T.C. Memo 1997-259 (and cases cited therein).  The majority of these cases, like the present case, raised issues regarding additions to tax for negligence and valuation overstatement.  We have found the taxpayers liable for such additions to tax in all but one of the opinions to date on these issues.

In Provizer v. Commissioner, supra, a test case for the Plastics Recycling group of cases, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the Clearwater transaction was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c).  In reaching the conclusion that the Clearwater transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that their investment in the Sentinel EPE recyclers in this case is similar to the investment described in Provizer v. Commissioner, supra. The underlying transactions in this case, and the Sentinel EPE recyclers purportedly leased by Plymouth, are the same type of transactions and same type of machines considered in Provizer v. Commissioner, supra.

Based on the entire record in this case, including the extensive stipulations, testimony of respondent's experts, and petitioner's testimony, we hold that the Plymouth transaction was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiency. We note that petitioners have explicitly conceded this issue in the stipulation of settled issues filed shortly before trial. The record plainly supports respondent's determination regardless of such concession. For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

A. Section 6653(a)--Negligence

Respondent asserted the additions to tax for negligence under section 6653(a)(1) and (2) for 1981 in an amended answer. Ordinarily, because these additions to tax were raised for the

first time in an amended answer, respondent would have the burden of proof. Rule 142(a); Vecchio v. Commissioner, 103 T.C. 170, 196 (1994); Bagby v. Commissioner, 102 T.C. 596, 612 (1994). However, by order dated April 1, 1994, this Court granted a motion for sanctions by respondent, and the burden of proof with respect to the negligence issues in this case was placed on petitioners.

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment. McPike v. Commissioner, T.C.

Memo. 1996-46.  Compare <u>Spears v. Commissioner</u>, T.C. Memo. 1996-341 with <u>Zidanich v. Commissioner</u>, T.C. Memo. 1995-382.

Petitioners contend that they were reasonable in claiming a loss deduction and investment tax and business energy credits with respect to Plymouth.  Petitioner maintains that he expected an economic profit in light of the so-called oil crisis in the United States in 1981, and that he reasonably relied upon Bach as a qualified adviser on this matter.

### 1.  The So-Called Oil Crisis

Petitioner claims that he reasonably expected to make an economic profit because plastic is an oil derivative and the United States was experiencing a so-called oil crisis when he invested in Plymouth.  Based upon our review of the record, we find petitioner's claim unconvincing, regardless of the so-called oil crisis.  Moreover, testimony by one of respondent's experts establishes that the oil pricing changes during the late 1970's and early 1980's did not justify petitioners' claiming excessive investment credits and purported losses based on vastly exaggerated valuations of recycling machinery.

Petitioner testified that he "was told by Marty [Bach] or Abe Bramnick that the potential of the investment is great because oil is going crazy and this thing was something".  Bramnick did not testify at the trial of this case, and Bach could not recall the substance of his communications with petitioner.  Petitioner did not read the Plymouth offering

memorandum or in any manner attempt to research the business aspects of the Plymouth transaction. In view of petitioners' failure seriously to investigate or learn about the Plymouth transaction, we are not convinced that they invested in Plymouth with an honest objective of making an economic profit, regardless of the so-called oil crisis.

Moreover, petitioners did not adequately explain how the so-called oil crisis provided a reasonable basis for them to invest in Plymouth and claim the associated operating loss and credits. The offering memorandum warned that there could be no assurances that prices for new resin pellets would remain at their then current level. One of respondent's experts, Steven Grossman, explained that the price of plastics materials is not directly proportional to the price of oil. In his report, he stated that less than 10 percent of crude oil is utilized for making plastics materials and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products." Furthermore, during 1980 and 1981, in addition to the media coverage of the so-called oil crisis, there was "extensive continuing press coverage of questionable tax shelter plans." Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), is misplaced. The facts in the Krause case are

distinctly different from the facts of this case. In the <u>Krause</u> case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The <u>Krause</u> opinion states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. <u>Id.</u> at 135-136. In holding that the taxpayers in the <u>Krause</u> case were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970s and early 1980s to invest in EOR technology." <u>Id.</u> at 177. In the present case, however, as explained by respondent's expert Steven Grossman, the price of plastics materials was not directly proportional to the price of oil, and there is no persuasive evidence that the so-called oil crisis had a substantial bearing on petitioners' decision to invest. While EOR was, according to our <u>Krause</u> opinion, in the forefront of national policy and the media during the late 1970's and 1980's, there is no showing in the record that the so-called energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene, particularly in the machinery here in question.

In addition, the taxpayers in the <u>Krause</u> opinion were experienced in or investigated the oil industry and EOR technology specifically. One of the taxpayers in the <u>Krause</u> case

undertook significant investigation of the proposed investment including researching EOR technology. The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials. Id. at 166. In the present case, petitioners are not experienced or educated in plastics recycling, and they did not independently investigate the Sentinel EPE recyclers or hire an expert in plastics to evaluate the Partnership transactions. We consider petitioners' arguments with respect to the Krause case inapplicable.

## 2. Petitioner's Purported Reliance on an Adviser

Petitioner contends that he reasonably relied upon Bach as a qualified adviser on this matter.

A taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) if he or she reasonably relied on competent professional advice. United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered. Freytag v. Commissioner, supra. For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that such professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter. David v. Commissioner, 43

F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra; Buck v. Commissioner, T.C. Memo. 1997-191; Sacks v. Commissioner, T.C. Memo. 1994-217, affd. 82 F.3d 918 (9th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); see also, e.g., Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, T.C. Memo. 1997-259; Friedman v. Commissioner, T.C. Memo. 1996-558; Gollin v. Commissioner, T.C. Memo. 1996-454; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence. Goldman v. Commissioner, supra; Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v. Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied

upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. David v. Commissioner, supra; Goldman v. Commissioner, supra; Freytag v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557 (1985); Buck v. Commissioner, supra; Lax v. Commissioner, T.C. Memo. 1994-329, affd. without published opinion 72 F.3d 123 (3d Cir. 1995); Sacks v. Commissioner, supra; Steerman v. Commissioner, T.C. Memo. 1993-447; Rogers v. Commissioner, T.C. Memo. 1990-619; see also the Plastics Recycling cases cited in Sann v. Commissioner, supra.

Bach has no education or work experience in engineering, plastics materials, or plastics recycling. His investigation of the Plastics Recycling transactions and Plymouth consisted of a review of the offering memorandum, plus a visit to the PI plant and some end-users chosen by a PI representative. Bach acknowledged that he does not "have a great technical background" and that he "didn't understand the technicalities of the machine too well even though it was explained to [him]". Because of his limited technical background, the only question he posed to the end-users with whom he spoke was whether the machine broke down.

Bach indicated that he deferred to Gardino with respect to the technical aspects of the Sentinel EPE recycler. He claimed that Gardino had a technical background, understood the technicalities of the machine, and "asked a lot of questions about how the machine operates, what it does." When asked if he

could elaborate on Gardino's technical background, however, Bach replied: "No. All I know is that * * * he was the head of the syndicate department and used to pass on all offerings that came into * * * his place of business, * * * and even though he wasn't an engineer, he had an engineering background." Bach did not know what type of degree Gardino earned in college or whether he had any experience in plastics recycling. Gardino did not testify at the trial of this case.

Bach acknowledged that he was not qualified to assess the value of the Sentinel EPE recycler. He did not consult an independent appraiser or anyone with expertise in plastics materials or plastics recycling. Bach relied upon the Plymouth offering memorandum for the value of the machine. He recalled reading "an independent appraisal stating how they got to the value of the machine based upon the production, the income the pellets would bring". However, Bach did not investigate the market for recycled resin pellets. Nor did he contact Ulanoff or Burstein, or inquire whether they had an interest in the Plastics Recycling transactions. He concluded that the author of the appraisal was independent based solely on the offering memorandum. In fact, Ulanoff and Burstein each invested in several Plastics Recycling partnerships, and as the offering memorandum disclosed, Burstein was a client and business associate of the corporate counsel to PI, Miller.

Upon returning from his visit to the PI plant in Hyannis, Bach recalled speaking to petitioner about his observations, "but not face-to-face. I know we spoke on the telephone." However, Bach could not recall the substance of his communication with petitioner or for how long they spoke on the phone. Petitioner claims that he and his wife had a dinner meeting with Bach to discuss his observations at PI. According to petitioner, Bach informed him over dinner that Plymouth "was a wonderful deal," that another of Bach's clients purportedly "felt it was very good," and that Bach intended to accompany another client to Hyannis. Bach has no recollection of any such meeting.

We hold that petitioner's purported reliance on Bach was not reasonable, not in good faith, nor based upon full disclosure. Petitioner met and retained Bach to prepare his and his wife's tax return in 1981. Bach characterized petitioners as an annual tax account whom he saw infrequently. Bramnick was at least one of petitioner's stock brokers and sometimes was an investment adviser to petitioner. Bramnick introduced the Plastics Recycling transactions and Plymouth to petitioner, as well as to Bach. His firm, Bond Richmond, was the offeree representative for petitioners and as such received a 10-percent commission on petitioners' investment. Bach testified that he spoke mostly to Bramnick with respect to Plymouth and that Bramnick saw petitioner on a regular basis. However, notwithstanding

Bramnick's obvious involvement in this matter, petitioner purports to have relied on Bach.

Bach does not have any education, experience, or expertise in engineering, plastics materials, or plastics recycling. He indicated that his lack of technical background hindered his investigation of Plymouth and the Sentinel EPE recycler. Bach acknowledged that he had no competence to value the machines; yet he did not independently confirm their value or the economic viability of the Plastics Recycling transactions. Instead, he relied on the offering memorandum and representations by insiders for the value of the machines and the economic viability of the Plastics Recycling transactions. See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion."

The purported value of the Sentinel EPE recycler generated the deductions and credits in this case, and that circumstance was reflected in the Plymouth offering memorandum. Petitioners did not read the offering memorandum, but Bach did. Certainly Bach recognized and understood the nature of the tax benefits, and he discussed Plymouth and his investigation with Bramnick and petitioner. In his discussions with Bach and Bramnick, petitioner learned or should have learned about the amount and nature of the tax benefits. Indeed, the tax benefits involved herein were not inconsequential and certainly would have been of interest to petitioners in a year in which they recognized in

excess of $300,000 in capital gains, mostly short-term gains. Bramnick urged that petitioner acquire two units of the Plymouth partnership for $100,000, but Bach, the tax return preparer, counseled that $50,000 of this transaction was enough. The direct reductions claimed on petitioners' 1981 tax return, from the investment tax credits alone, equaled 165 percent of their cash investment. Therefore, like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners never had any money in the * * * [Plymouth transaction]." A reasonably prudent person would have asked a qualified adviser if such a windfall were not too good to be true. McCrary v. Commissioner, 92 T.C. at 850.

Petitioner's own testimony is the only account in the record regarding the advice petitioner received from Bach and Bramnick. Bach could not recall the substance of his communications with petitioner, and Bramnick did not testify in the trial of this case.[4] Petitioner's testimony in this case is self-serving and often not credible, and this Court is not required to accept it

---

[4] Petitioners failure to call Bramnick to testify gives rise to the inference that his testimony would not have been favorable to them. See Mecom v. Commissioner, 101 T.C. 374, 386 (1993), affd. without published opinion 40 F.3d 385 (5th Cir. 1994); Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); Sacks v. Commissioner, T.C. Memo. 1994-217, affd. 82 F.3d 918 (9th Cir. 1996).

as true.  Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Snyder v. Commissioner, T.C. Memo. 1995-285; Sacks v. Commissioner, T.C. Memo. 1994-217.  Petitioner owned significant interests in two successful floor covering companies, participated in successful real estate ventures and IPO's, and in 1981 his investment decisions yielded capital gains in excess of $300,000.  His demonstrated business acumen and investment sophistication show that he possessed the intelligence and experience to recognize that further investigation of the transaction in issue was required.  A taxpayer may rely upon his adviser's expertise (in this case accounting), but it is not reasonable or prudent to rely upon an adviser regarding matters outside of his field of expertise or with respect to facts that he does not verify.  See David v. Commissioner, 43 F.3d at 789-790; Goldman v. Commissioner, 39 F.3d at 408; Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. sub nom. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner, T.C. Memo. 1994-329; Sacks v. Commissioner, supra; Rogers v. Commissioner, T.C. Memo. 1990-619.

3.  Miscellaneous

Petitioners stipulated that the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000. Notwithstanding this concession, petitioners contend that they

were reasonable in claiming credits on their 1981 Federal income tax return based upon each recycler's having a value of $1,162,666. In support of this position, petitioners submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates. Carmagnola had been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the [recyclers] by the owners." Based on limited information available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE recycler was $250,000. However, after additional information became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the Fall of 1981.

We accord no weight to the Carmagnola reports submitted by petitioners. The projected valuations therein were based on inadequate information, research, and investigation, and were subsequently rejected and discredited by their author. In one preliminary report, Carmagnola states that he has "a serious concern of actual profit" of a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs

of the machines and that he estimated those costs in his valuations of the machines.

Respondent rejected the Carmagnola reports and considered them unsatisfactory for any purpose, and there is no indication in the record that respondent used them as a basis for any determinations in the notice of deficiency. Even so, counsel for petitioners obtained copies of these reports and urge that they support the reasonableness of the value reported on petitioners' 1981 return. Not surprisingly, petitioners' counsel did not call Carmagnola to testify in this case, but preferred instead to rely solely upon his preliminary ill-founded valuation estimates (Carmagnola has not been called to testify in any of the Plastics Recycling cases before us). The Carmagnola reports were a part of the record considered by this Court and reviewed by the Sixth Circuit Court of Appeals in the Provizer case, where we held the taxpayers negligent. Consistent therewith, we find in this case, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no consequence.

Petitioners cite a number of cases in support of their position, including Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), affg. in part and revg. in part without published opinion Osterhout v. Commissioner, T.C. Memo. 1993-251; Durrett v. Commissioner, 71 F.3d 515 (5th Cir. 1996), affg. in part and revg. in part T.C. Memo. 1994-179; Chamberlain v. Commissioner, 66 F.3d 729 (5th Cir. 1995), affg. in part and

revg. in part T.C. Memo. 1994-228; Mollen v. United States, 72 AFTR 2d 93-6443, 93-2 USTC par. 50,585 (D. Ariz. 1993); Wright v. Commissioner, T.C. Memo. 1994-288; Daoust v. Commissioner, T.C. Memo. 1994-203; Wood v. Commissioner, T.C. Memo. 1991-205; and Davis v. Commissioner, T.C. Memo. 1989-607.

Petitioners' reliance on the Wright, Daoust, Wood, and Davis cases is misplaced. The taxpayers in the Wright case had an objective of making a profit; relied upon an adviser who expressly recommended the subject investment; reviewed the offering memorandum; were advised that the investment had already survived an IRS audit unchanged; and personally monitored the investment. In the Daoust case, the taxpayer husband relied upon the advice of two qualified independent investment advisers and an independent C.P.A., who also was the taxpayer husband's brother. In the Wood case, a group of consolidated cases, a financial planner recommended the investment, all of the taxpayers had profit objectives, the transactions were not sham transactions, and one taxpayer husband and wife inspected the equipment at issue. The taxpayers in the Davis case relied in part upon the express recommendation of a "trusted and long-term adviser", and in part upon their review of the offering materials (which did not reflect that the principals in the venture lacked experience in the pertinent line of business). Davis v. Commissioner, supra. In contrast to those cases, Bach was not a trusted and long-term adviser to petitioners but a recently

employed tax return preparer, and there is no showing in the record that he expressly recommended Plymouth to them. Petitioners did not read the offering memorandum, see a Sentinel EPE recycler, or make any effort to learn about the Plymouth transactions. In addition, the Plymouth transaction is a sham lacking economic substance, and we are not convinced that petitioners had an honest objective of making a profit. Accordingly, we consider the Wright, Daoust, Wood, and Davis cases distinguishable from the instant case.

In Mollen v. United States, supra, the taxpayer was a medical doctor who specialized in diabetes and who, on behalf of the Arizona Medical Association, led a continuing medical education (CME) accreditation program for local hospitals. The underlying tax matter involved the taxpayer's investment in Diabetics CME Group, Ltd., a limited partnership which invested in the production, marketing, and distribution of medical educational video tapes. The District Court found that the taxpayer's personal expertise and insight in the underlying investment gave him reason to believe it would be economically profitable. Although the taxpayer was not experienced in business or tax matters, he did consult with an accountant and a tax lawyer regarding those matters. Moreover, the District Court noted that the propriety of the taxpayer's disallowed deduction therein was "reasonably debatable." See Zfass v. Commissioner, __

F.3d ___ (4th Cir. June 23, 1997), affg. T.C. Memo. 1996-167, and sustaining findings of negligence in a similar transaction.

In contrast, petitioners and their purported adviser did not have any personal insight or industry know-how in plastics recycling that would reasonably lead them to believe that the Plastics Recycling transactions would be economically profitable. Further, neither Bach nor petitioners consulted or hired any independent experts in the field of plastic materials or plastics recycling.[5] Instead, they relied upon the offering materials and representations by insiders to the Plastics Recycling transactions. We consider petitioners' arguments with respect to Mollen v. United States, supra, inapplicable under the circumstances of this case, particularly in light of the opinion of the Court of Appeals for the Fourth Circuit in Zfass v. Commissioner, supra.

Petitioners' reliance upon the Court of Appeals for the Ninth Circuit's partial reversal of our decision in Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), is misplaced. In Osterhout, we found that certain oil and gas partnerships were

---

[5] Bach testified that he discussed the Plastics Recycling transactions and visited PI with Gardino, whom he claims had a technical background. However, Gardino did not testify in this case, and the record does not show that he was qualified to analyze the Sentinel EPE recycler or the Plastics Recycling transactions.

not engaged in a trade or business and sustained respondent's imposition of the negligence additions to tax with respect to one of the partners therein.[6]  The Court of Appeals for the Ninth Circuit reversed our imposition of the negligence additions to tax.  Petitioners point out that the taxpayer in that case relied in part upon a tax opinion contained in the offering materials.  However, petitioners did not read the Plymouth offering memorandum, let alone the tax opinion appended thereto.

Moreover, the Plymouth offering memorandum warned prospective investors that the accompanying tax opinion letter was not in final form and was prepared for the general partner, and that prospective investors should consult their own professional advisers with respect to the tax benefits and tax risks associated with Plymouth.  The tax opinion letter accompanying the Plymouth offering memorandum was addressed solely to the general partner and began with the following opening disclaimer:

> This opinion is provided to you for your individual guidance.  We expect that prospective investors will rely upon their own professional advisors with respect to all tax issues arising in connection with their

---

[6]      Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), involved a group of consolidated cases.  The parties therein agreed to be bound by the Court's opinion regarding the application of the additions to tax under sec. 6653(a), inter alia.  Accordingly, although the Court's analysis focused on one taxpayer, the additions to tax were sustained with respect to all of the taxpayers.

>investment in the Partnership and the operations thereof.  We recognize that you intend to include this letter with your offering materials and we have consented to that with the understanding that <u>the purpose in distributing it is</u> to assist your offerees' tax advisors in making their own analysis and <u>not to permit any prospective investor to rely upon our advice in this matter</u>.  [Emphasis added.]

Accordingly, the tax opinion letter expressly indicated that prospective investors such as petitioners were not to rely upon the tax opinion letter.  See <u>Collins v. Commissioner</u>, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. <u>Dister v. Commissioner</u>, T.C. Memo. 1987-217.  The limited, technical opinion of tax counsel expressed in this letter was not designed as advice upon which taxpayers might rely and the opinion of counsel itself so states.

Petitioners' reliance on the <u>Durrett</u> and <u>Chamberlain</u> cases is also misplaced.  In those cases, the Court of Appeals for the Fifth Circuit reversed this Court's imposition of the negligence additions to tax in two nonplastics recycling cases.  The taxpayers in the <u>Durrett</u> and <u>Chamberlain</u> cases were among thousands who invested in the First Western tax shelter program involving alleged straddle transactions of forward contracts.  In the <u>Durrett</u> and <u>Chamberlain</u> cases, the Court of Appeals for the Fifth Circuit concluded that the taxpayers reasonably relied upon professional advice concerning tax matters.  In other First Western cases, however, the Courts of Appeals have affirmed decisions of the Tax Court imposing negligence additions to tax.  See <u>Foulds v. Commissioner</u>, T.C. Memo. 1994-489 (the well-

educated taxpayer failed to establish the substance of advice, and the purported adviser lacked tax expertise), affd. without published opinion 94 F.3d 651 (9th Cir. 1996); Chakales v. Commissioner, T.C. Memo. 1994-408 (reliance on long-term adviser, who was a tax attorney and accountant, and who in turn relied on a promoter of the venture, held unreasonable), affd. 79 F.3d 726 (8th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430 (reliance on adviser held unreasonable absent a showing that the adviser understood the transaction and was qualified to give an opinion whether it was bona fide), affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); Freytag v. Commissioner, 89 T.C. 849 (1987)(reliance on tax advice given by attorneys and C.P.A.'s held unreasonable absent a showing that the taxpayers consulted any experts regarding the bona fides of the transactions).

Bach did not possess sufficient knowledge of the plastics or recycling industries to render a competent opinion. This fact has been deemed relevant by the Court of Appeals for the Second Circuit. See David v. Commissioner, 43 F.3d at 789-790 (taxpayers' reliance on expert advice not reasonable where expert lacks knowledge of business in which taxpayers invested), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994) (same), affg. T.C. Memo. 1993-480. Accordingly, petitioners will not be relieved of the negligence additions to

tax based upon the decisions in the <u>Durrett</u> and <u>Chamberlain</u> cases by the Court of Appeals for the Fifth Circuit.

### 4. Conclusion as to Negligence

Under the circumstances of this case, petitioners failed to exercise due care in claiming a large loss deduction and tax credits with respect to Plymouth on their 1981 Federal income tax return. Petitioner declined to read the offering memorandum, visit PI, or otherwise learn about the Plymouth transactions and the Sentinel EPE recycler to any significant extent. Instead, petitioner purports to have relied on Bach, the accountant he only recently had retained to prepare petitioners' tax return. Bach had no education or experience in plastics materials or plastics recycling, and he ultimately relied upon the offering memorandum for the value of, capabilities, and market demand for the machines. The tax benefits flowing from Plymouth were contingent upon the purported value of the Sentinel EPE recycler. Yet neither petitioner nor Bach in good faith investigated the fair market value of a Sentinel EPE recycler, or the underlying viability, financial structure, and economics of the Plymouth transaction. We hold, upon consideration of the entire record, that petitioners are liable for the negligence additions to tax under section 6653(a)(1) and (2) for the taxable year at issue. We note that in this case because of sanctions, petitioners have the burden of proof with respect to negligence. However, on this record respondent has proved petitioners' negligence, and our

holding on this issue is the same, regardless of the incidence of the burden of proof. Respondent is sustained on this issue.

B. Section 6659--Valuation Overstatement

In the notice of deficiency, respondent determined that petitioners were liable for the section 6659 addition to tax on the portion of their underpayment attributable to valuation overstatement. In respondent's trial memorandum and posttrial brief, respondent conceded that the section 6659 addition to tax is to be applied only to the portion of the deficiency attributable to the disallowed investment tax and business energy credits derived from Plymouth. Petitioners have the burden of proving that respondent's determination of the section 6659 addition to tax is erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is attributable to" a valuation overstatement. Sec. 6659(a), (d). A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount. Sec. 6659(c). If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment. Sec. 6659(b).

Petitioners claimed tax benefits, including investment tax credits and business energy credits, based on a purported value

of $1,162,666 for each Sentinel EPE recycler. Petitioners concede that the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000. Therefore, if disallowance of petitioners' claimed tax benefits is attributable to such valuation overstatements, petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the investment tax and business energy credits claimed with respect to Plymouth.

Petitioners contend that section 6659 does not apply in their case for the following three reasons: (1) Disallowance of the claimed tax benefits was attributable to other than a valuation overstatement; (2) petitioners' concession of the claimed tax benefits precludes imposition of the section 6659 addition to tax; and (3) respondent erroneously failed to waive the section 6659 addition to tax. We reject each of these arguments for reasons set forth below.

### 1. The Grounds for Petitioners' Underpayments

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements. See McCrary v. Commissioner, 92 T.C. at 827; Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements. Krause v.

Commissioner, 99 T.C. at 178 (citing Todd v. Commissioner, supra). However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable. See Zfass v. Commissioner, ___ F.3d ___ (4th Cir. June 23, 1997), affg. T.C. Memo. 1996-167; Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (the section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner, T.C. Memo. 1991-321.

Petitioners argue that the disallowance of the claimed investment tax and business energy credits was not "attributable to" a valuation overstatement. According to petitioners, the credits were disallowed because the Plymouth transaction lacked economic substance, not because of any valuation overstatement. It follows, petitioners reason, that because the "attributable to" language of section 6659 requires a direct causative relationship between a valuation overstatement and an underpayment in tax, section 6659 cannot apply to their deficiency. Petitioners cite the following cases to support this argument: Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408; Gainer v. Commissioner, 893 F.2d 225

(9th Cir. 1990), affg. T.C. Memo. 1988-416; McCrary v. Commissioner, supra; Todd v. Commissioner, supra.

Petitioners' argument rests on the mistaken premise that our holding herein that the Plymouth transaction lacked economic substance was separate and independent from the overvaluation of the Sentinel EPE recyclers. To the contrary, in holding that the Plymouth transaction lacked economic substance, we relied heavily upon the overvaluation of the recyclers. Overvaluation of the recyclers was an integral factor in regard to: (1) The disallowed tax credits and operating loss; (2) the underpayment of tax; and (3) our finding that the Plymouth transaction lacked economic substance.

Petitioners argue that in Provizer v. Commissioner, T.C. Memo. 1992-177, we found that the Clearwater transaction lacked economic substance for reasons independent of the valuation reported in that case. According to petitioners, the purported value of the recyclers in the Clearwater transaction was predicated upon a projected stream of royalty income, and this Court merely rejected the taxpayer's valuation method. Petitioners misread and distort our Provizer opinion. In the Provizer case, overvaluation of the Sentinel EPE recyclers, irrespective of the technique employed by the taxpayers in their efforts to justify the overvaluation, was the dominant factor that led us to hold that the Clearwater transaction lacked economic substance. Likewise, overvaluation of the Sentinel EPE

recyclers in this case is the ground for our holding herein that the Plymouth transaction lacked economic substance.

Moreover, a virtually identical argument was rejected in Gilman v. Commissioner, supra. In the Gilman case, the taxpayers engaged in a computer equipment sale and leaseback transaction that this Court held was a sham transaction lacking economic substance. The taxpayers therein, citing Todd v. Commissioner, supra, and Heasley v. Commissioner, supra, argued that their underpayment of taxes derived from nonrecognition of the transaction for lack of economic substance, independent of any overvaluation. The Court of Appeals for the Second Circuit sustained imposition of the section 6659 addition to tax because overvaluation of the computer equipment contributed directly to this Court's earlier conclusion that the transaction lacked economic substance and was a sham. Gilman v. Commissioner, supra at 151. In addition, the Court of Appeals for the Second Circuit agreed with this Court and with the Court of Appeals for the Eighth Circuit that "'when an underpayment stems from disallowed * * * investment credits due to lack of economic substance, the deficiency is * * * subject to the penalty under section 6659.'" Gilman v. Commissioner, supra at 151 (quoting Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427); see also Zfass v. Commissioner, supra; Rybak v. Commissioner, 91 T.C. at 566-567; Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-

181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993).

Petitioners' reliance on Gainer v. Commissioner, supra, Todd v. Commissioner, supra, and McCrary v. Commissioner, 92 T.C. at 827, is misplaced. In those cases, in contrast to the case herein, it was found that a valuation overstatement did not contribute to an underpayment of taxes. In the Todd and Gainer cases, the underpayments were due exclusively to the fact that the property in each case had not been placed in service. In the McCrary case, the underpayments were deemed to result from a concession that the agreement at issue was a license and not a lease. Although property was overvalued in each of those cases, the overvaluations were not the grounds on which the taxpayers' liability was sustained. In contrast, "a different situation exists where a valuation overstatement * * * is an integral part of or is inseparable from the ground found for disallowance of an item." McCrary v. Commissioner, supra at 859. Petitioners' case presents just such a "different situation": overvaluation of the recyclers was integral to and inseparable from petitioners' claimed tax benefits and our holding that the Plymouth transaction lacked economic substance.[7]

---

[7] To the extent that Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, merely represents an application of Todd v. Commissioner, 89 T.C. 912 (1987), affd.
(continued...)

## 2. Concession of the Deficiency

Petitioners argue that their concession of the deficiency precludes imposition of the section 6659 addition to tax. Petitioners contend that their concession renders any inquiry into the grounds for such deficiency moot. Absent such inquiry, petitioners argue that it cannot be known if their underpayment was attributable to a valuation overstatement or other discrepancy. Without a finding that a valuation overstatement contributed to an underpayment, according to petitioners, section 6659 cannot apply. In support of this line of reasoning, petitioners rely heavily upon Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), and McCrary v. Commissioner, supra.

Petitioners' open-ended concession does not obviate our finding that the Plymouth transaction lacked economic substance due to overvaluation of the recyclers. This is not a situation where we have "to decide difficult valuation questions for no reason other than the application of penalties." See McCrary v. Commissioner, supra at 854 n.14. The value of the Sentinel EPE

[7](...continued)
862 F.2d 540 (5th Cir. 1988), we consider it distinguishable. To the extent that the reversal in the Heasley case is based on a concept that where an underpayment derives from the disallowance of a transaction for lack of economic substance, the underpayment cannot be attributable to an overvaluation, this Court and the Courts of Appeals for the Second, Fourth, Sixth and Eighth Circuits have disagreed. See Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement), affg. T.C. Memo. 1989-684; Zfass v. Commissioner, supra.

recycler was established in <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, and stipulated by the parties. As a consequence of the inflated value assigned to the recyclers by Plymouth, petitioners claimed an operating loss deduction and credits that resulted in an underpayment of tax, and we held that the Plymouth transaction lacked economic substance. Regardless of petitioners' concession, in this case the underpayment of tax was attributable to the valuation overstatement.

Moreover, concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. See <u>Dybsand v. Commissioner</u>, T.C. Memo. 1994-56; <u>Chiechi v. Commissioner</u>, T.C. Memo. 1993-630. Instead, the ground upon which the investment tax credit is disallowed or conceded is significant. <u>Dybsand v. Commissioner</u>, <u>supra</u>. Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax. <u>Gainer v. Commissioner</u>, 893 F.2d at 228; <u>Irom v. Commissioner</u>, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part T.C. Memo. 1988-211; <u>Harness v. Commissioner</u>, T.C. Memo. 1991-321.

In the present case, no argument was made and no evidence was presented to the Court to prove that disallowance and concession of the claimed investment tax credits and other tax benefits related to anything other than a valuation

overstatement. To the contrary, petitioners stipulated substantially the same facts concerning the Plymouth transaction as we found in Provizer v. Commissioner, supra. In the Provizer case, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers. The overvaluation of the recyclers, exceeding 2,325 percent, was an integral part of our findings in Provizer that the transaction was a sham and lacked economic substance. Similarly, the record in this case plainly shows that the overvaluation of the recyclers is integral to and is the core of our holding that the Plymouth transaction was a sham and lacked economic substance.

Petitioners' reliance on McCrary v. Commissioner, supra, is misplaced. In that case, the taxpayers conceded disentitlement to their claimed tax benefits and the section 6659 addition to tax was held inapplicable. However, the taxpayers' concession of the claimed tax benefits, in and of itself, did not preclude imposition of the section 6659 addition to tax. In McCrary v. Commissioner, supra, the section 6659 addition to tax was disallowed because the agreement at issue was conceded to be a license and not a lease. In contrast, the record in this case plainly shows that petitioners' underpayment was attributable to overvaluation of the Sentinel EPE recyclers. We hold that

petitioners' reliance on <u>McCrary v. Commissioner</u>, 92 T.C. at 827, is inappropriate.[8]

We held in <u>Provizer v. Commissioner</u>, <u>supra</u>, that each Sentinel EPE recycler had a fair market value not in excess of $50,000. Our finding in the <u>Provizer</u> case that the Sentinel EPE recyclers had been overvalued was integral to and inseparable from our holding of a lack of economic substance. Petitioners stipulated that the Plymouth transaction was similar to the Clearwater transaction described in the <u>Provizer</u> case, and that the fair market value of a Sentinel EPE recycler in 1981 was not in excess of $50,000. Given those concessions, and the fact that the record here plainly shows that the overvaluation of the recyclers was the only reason for the disallowance of the claimed investment tax and business energy credits, we conclude that the amount of the deficiency corresponding thereto was attributable to overvaluation of the Sentinel EPE recyclers.

3. <u>Section 6659(e)</u>

Petitioners argue that respondent erroneously failed to waive the section 6659 addition to tax. Section 6659(e) authorizes respondent to waive all or part of the addition to tax

---

[8] Petitioners' citation of <u>Heasley v. Commissioner</u>, <u>supra</u>, in support of the concession argument is also inappropriate. That case was not decided by the Court of Appeals for the Fifth Circuit on the basis of a concession. Moreover, see <u>supra</u> note 8 to the effect that the Courts of Appeals for the Second, Fourth, Sixth, and Eighth Circuits and this Court have not followed the <u>Heasley</u> opinion with respect to the application of sec. 6659.

for valuation overstatement if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith. Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion. Krause v. Commissioner, 99 T.C. at 179. Abuse of discretion has been found in situations where respondent's refusal to exercise her discretion is arbitrary, capricious, or unreasonable. See Mailman v. Commissioner, 91 T.C. 1079 (1988); Estate of Gardner v. Commissioner, 82 T.C. 989 (1984); Haught v. Commissioner, T.C. Memo. 1993-58.

We note initially that petitioners did not request respondent to waive the section 6659 addition to tax until more than 4 months after the trial of this case. We are reluctant to find that respondent abused any discretion in this case when respondent was not timely requested to exercise it and there is no direct evidence of any abuse of administrative discretion. Haught v. Commissioner, supra; cf. Wynn v. Commissioner, T.C. Memo. 1995-609; Klieger v. Commissioner, T.C. Memo. 1992-734.

However, we do not decide this issue solely on petitioners' failure timely to request a waiver but instead, we have considered the issue on its merits. Petitioners urge that petitioner relied on Bach in deciding on the valuation claimed on their 1981 tax return. Petitioners contend that such reliance was reasonable and, therefore, that respondent should have waived

the section 6659 addition to tax.  However, as we explained above in finding petitioners liable for the negligence additions to tax, petitioner's purported reliance on Bach was not reasonable. Bach did not have any education or experience in plastics materials or plastics recycling.  He acknowledged that he was not qualified to assess the machines and that his technical limitations hindered his investigation at Hyannis.  In the end, neither petitioner nor Bach in good faith investigated the fair market value of a Sentinel EPE recycler, or the underlying viability, financial structure, and economics of the Plymouth transaction.

In support of the contention that petitioner acted reasonably, petitioners cite Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23.  However, the facts in the Mauerman case are distinctly different from the facts of this case.  In Mauerman, the Court of Appeals for the Tenth Circuit held that there was an abuse of discretion on the part of the Commissioner for not waiving a section 6661 addition to tax.  Like section 6659, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith.  Sec. 6661(c).  The taxpayer in Mauerman relied upon independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized.  The advice relied upon by the taxpayer in Mauerman was within the

scope of the advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. In the present case, however, particularly with respect to valuation, petitioner relied upon advice which was outside the scope of expertise and experience of the purported adviser. Bach had no education, special qualifications, or professional skills or experience in plastics engineering, plastics recycling, or plastics materials. Consequently, we consider petitioners' reliance on the <u>Mauerman</u> case inapplicable.

We hold that petitioners did not have a reasonable basis for the adjusted bases or valuations claimed on their 1981 tax return with respect to their investment in Plymouth. In this case, respondent could find that petitioner's reliance on Bach was unreasonable. The record in this case does not establish an abuse of discretion on the part of respondent but supports respondent's position. We hold that respondent's refusal to waive the section 6659 addition to tax in this case is not an abuse of discretion. Petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the disallowed investment tax and business energy credits. Respondent is sustained on this issue.

<u>C. Petitioners' Motion for Leave To File Motion for Decision Ordering Relief from the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law</u>

Approximately 4 months after the trial of this case, petitioners filed a Motion For Leave to File Motion for Decision

Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and to File Supporting Memorandum of Law under Rule 50. Petitioners also lodged with the Court a motion for decision ordering relief from the additions to tax for negligence and from the increased rate of interest, with attachments and a memorandum in support of such motion. Respondent filed an objection, with attachments and a memorandum in support thereof, and petitioners thereafter filed a reply memorandum. Petitioners argue that they should be afforded the same settlement that was reached between other taxpayers and the IRS in docket Nos. 10382-86 and 10383-86, each of which was styled Miller v. Commissioner. See Farrell v. Commissioner, T.C. Memo. 1996-295 (denying a motion similar to petitioners' motions); see also Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, T.C. Memo. 1997-259; Friedman v. Commissioner, T.C. Memo. 1996-558; Jaroff v. Commissioner, T.C. Memo. 1996-527; Gollin v. Commissioner, T.C. Memo. 1996-454; Grelsamer v. Commissioner, T.C. Memo. 1996-399; Zenkel v. Commissioner, T.C. Memo. 1996-398.

Counsel for petitioners seek to raise a new issue long after the trial in this case. Resolution of such issue might well require a new trial. Such further trial "would be contrary to the established policy of this Court to try all issues raised in a case in one proceeding and to avoid piecemeal and protracted litigation." Markwardt v. Commissioner, 64 T.C. 989, 998 (1975); see also Haft Trust v. Commissioner, 62 T.C. 145, 147 (1974).

Consequently, under the circumstances here, at this late date in the litigation proceedings, long after trial and briefing and after the issuance of numerous opinions on issues and facts closely analogous to those in this case, petitioners' motion for leave is not well founded.  Farrell v. Commissioner, supra.

Even if petitioners' motion for leave were granted, the arguments set forth in their motion for decision and the attached memorandum, lodged with this Court, are invalid and such motion would be denied.  Therefore, and for reasons set forth in more detail below, petitioners' motion for leave shall be denied.

Some of our discussion of background and circumstances underlying petitioners' motion is drawn from documents submitted by the parties and findings of this Court in two earlier decisions.  See Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434.  These matters are not disputed by the parties.  We discuss the background matters for the sake of completeness.  As we have noted, granting petitioners' motion for leave would require further proceedings.

The Estate of Satin and Fisher cases involved Stipulation of Settlement agreements (piggyback agreements) made available to taxpayers in the Plastics Recycling project, whereby taxpayers could agree to be bound by the results of three test cases: Provizer v. Commissioner, T.C. Memo. 1992-177, and the two Miller cases.  We held in Estate of Satin and Fisher that the terms of the piggyback agreement bound the parties to the results in all

three lead cases, not just the <u>Provizer</u> case.  Petitioners assert that the piggyback agreement was extended to them, but they do not claim to have accepted the offer timely, so they effectively rejected it.[9]

On or about February of 1988, a settlement offer (the Plastics Recycling project settlement offer or the offer) was made available by respondent in all docketed Plastics Recycling cases, and subsequently in all nondocketed cases.  <u>Baratelli v. Commissioner</u>, T.C. Memo. 1994-484.  Pursuant to the offer, taxpayers had 30 days to accept the following terms:  (1) Allowance of a deduction for 50 percent of the amount of the cash investment in the venture in the year(s) of investment to the extent of loss claimed; (2) Government concession of the substantial understatement of tax penalties under section 6661 and the negligence additions to tax under section 6653(a)(1) and (2); (3) taxpayer concession of the section 6659 addition to tax for valuation overstatement and the increased rate of interest under section 6621; and (4) execution of a closing agreement (Form 906) stating the settlement and resolving the entire matter for all years.[10]  Petitioners assert that the Plastics Recycling

---

[9]    In their motion for decision, petitioners state: "After the lead counsel for taxpayers and Respondent had agreed upon the designation of the lead cases, <u>Respondent's counsel prepared piggyback agreements and offered them to counsel for the taxpayers in this case</u> and to other taxpayers." (Emphasis added.)

[10]    In respondent's motion for leave to file an amended answer,
(continued...)

project settlement offer was extended to them, but they do not claim to have accepted the offer timely, so they effectively rejected it.[11]

In December 1988, the Miller cases were disposed of by settlement agreement between the taxpayers and respondent.[12] This Court entered decisions based upon those settlements on December 22, 1988. The settlement provided that the taxpayers in the Miller cases were liable for the addition to tax under section 6659 for valuation overstatement, but not for the additions to tax under the provisions of section 6661 and section 6653(a). The increased interest under section 6621(c), premised solely upon Miller's interest in the recyclers for the taxable years at issue, was not applicable because Miller made payments prior to December 31, 1984, so no interest accrued after that

[10](...continued)
respondent attached a copy of a settlement offer that was extended to petitioners and other taxpayers who at the time were represented by counsel other than their present counsel. The terms of the offer were as stated above, except that no mention was made with respect to the execution of a closing agreement (Form 906) stating the settlement and resolving the entire matter for all years.

[11]    In their motion for decision, petitioners state: "Respondent formulated a standard settlement position which was extended to all taxpayers having docketed or non-docketed cases in the plastics recycling group, including Petitioner." (Emphasis added.)

[12]    Although it is not otherwise a part of the record in this case, respondent attached copies of the Miller closing agreement and disclosure waiver to her objection to petitioners' motion for leave, and petitioners do not dispute the accuracy of the document.

time.  Respondent did not notify petitioners or any other taxpayers of the disposition of the Miller cases.  Estate of Satin v. Commissioner, supra; Fisher v. Commissioner, supra.

Petitioners argue that they are similarly situated to Miller, the taxpayer in the Miller cases, and that pursuant to the principle of "equality" they are therefore entitled to the same settlement agreement executed by respondent and Miller in those cases.  In effect, petitioners seek to resurrect the piggyback agreement offer and/or the settlement offer they previously failed to accept.

Petitioners contend that under the principle of "equality," the Commissioner has a duty of consistency toward similarly situated taxpayers and cannot tax one and not tax another without some rational basis for the difference.  United States v. Kaiser, 363 U.S. 299, 308 (1960) (Frankfurter, J., concurring); see Baker v. United States, 748 F.2d 1465 (11th Cir. 1984); Farmers' & Merchants' Bank v. United States, 476 F.2d 406 (4th Cir. 1973).  According to petitioners, the principle of equality precludes the Commissioner from making arbitrary distinctions between like cases.  See Baker v. Commissioner, 787 F.2d 637, 643 (D.C. Cir. 1986), vacating 83 T.C. 822 (1984).

The different tax treatment accorded petitioners and Miller was not arbitrary or irrational.  While petitioners and Miller both invested in the Plastics Recycling transactions, their actions with respect to such investments provide a rational basis

for treating them differently. Miller foreclosed any potential liability for increased interest in his cases by making payments prior to December 31, 1984; no interest accrued after that date. In contrast, petitioners made no such payment, and they conceded that the increased rate of interest under section 6621(c) applies in their case. Liability for the increased rate of interest is the principal difference between the settlement in the Miller cases, which petitioners declined when they failed to accept the piggyback agreement offer, and the settlement offer that petitioners also failed to accept.

Petitioners argue that section 6621(c) must have been an issue in the Miller cases since each of the decisions recites "That there is no increased interest due from the petitioner[s] for the taxable years [at issue] under the provisions of IRC section 6621(c)." According to petitioners, "if the Millers were not otherwise subject to the penalty interest provisions because of the particular timing of their tax payments, there would have been no need for the Court to include such a recital in its decisions." This argument by petitioners is entirely conjectural and is not supported by the documentation on which counsel relies. In fact, the recital that no increased interest under section 6621(c) was due in the Miller cases was an express term of the settlement documents in those cases and apparently included in the decisions for completeness and accuracy. There is nothing on the record in the instant case, or in the Court's

opinions in <u>Estate of Satin v. Commissioner</u>, T.C. Memo. 1994-435, or <u>Fisher v. Commissioner</u>, T.C. Memo. 1994-434, or in any of the material submitted to us in this case that would indicate that the Millers were "otherwise subject to the penalty interest provisions". Petitioners' argument is based on a false premise.

We find that petitioners and Miller were treated equally to the extent they were similarly situated and differently to the extent they were not. Miller foreclosed the applicability of the section 6621(c) increased rate of interest in his cases, while petitioners concede it applies in their case. Petitioners failed to accept a piggyback settlement offer that would have entitled them to the settlement reached in the <u>Miller</u> cases and also rejected a settlement offer made to them prior to trial of a test case. In contrast, Miller negotiated for himself and accepted an offer that was essentially the same as the Plastics Recycling project settlement offer rejected by petitioners prior to trial. Accordingly, petitioners' motion is not supported by the principle of equality on which they rely. Cf. <u>Baratelli v. Commissioner</u>, T.C. Memo. 1994-484.

To reflect the foregoing,

<u>An appropriate order will be</u>
<u>issued denying petitioners'</u>
<u>motion, and decision will be</u>
<u>entered under Rule 155</u>.